## RHINER v. RHINER.

No. 18703.

Circuit Court, Brevard County.

October 4, 1962.

---

L. W. Blankner of Beardall, Gridley & Lewis, Orlando, for plaintiff.

Lee Jay Colling, Orlando, for defendant.

VOLIE A. WILLIAMS, Jr., Circuit Judge.

As the testimony in this child custody case drew to its close, it recalled to mind my college days. One of our history professors told us of the dispute among Lincolnphiles as to whom Lincoln was referring when he said, "All that I am or ever hope to be, I owe to my dear mother." Some Lincoln students take the position the reference was to Nancy Hanks Lincoln. Others say, "How could that be so when he was only eight years old when she died. Obviously, he must be referring to his step-mother, Sarah Bush Lincoln, who raised him." After one hundred years, the argument continues. Anyone would be a social pariah not to publicly reverence motherhood. In public office, it has been aptly said the best platform for a candidate is "to be for motherhood and against sin."

I rather suspect our society has become over-awed by this shroud of respectability which clings like pliofilm over "motherhood." This case gives credence to the fact that biological productivity alone does not make a female a "mother".

To most of us, motherhood envisions first of all, pain. Next, sacrifice; then, tender arms in which to be held; soft hands and warm lips with which to be caressed; words of praise when we learn to tie our shoes; a whole dime when we read all by ourselves, "I saw the dog run. Did you see the dog run?"; words of comfort when we skin our knees; an affectionate pat for no good reason at all; a whack on the bottom when we misbehaved.

She speaks to our spiritual side by her own devotion to Almighty Providence and by kneeling with us to say our prayers for as long as most of us can remember. She attends PTA for us, becomes Den Mother, acts as intercessor with father, referee with brothers and sisters, chief cook and bottle washer for friends and family. It is only after we become adult when we realize just how much molding and fashioning of our character was influenced by those attributes most generally found in normal mothers. Too,

it is only then when each of us arrives at the moment of truth as to the meaning of the word "love". We have all experienced it in some form. Yet, there is not one of us who can define it in a manner acceptable to another living soul. It is an individual sort of feeling which defies definition, except within the wells of our own hearts.

It is to her we owe our belief that love consists more in giving than in getting. She made us aware that a child's sense of security comes more from his knowledge of being loved than from any other source; that a child can be smothered if we are too possessive; that a child needs personal attention and companionship from a parent; that his trip to the lake, pool or playground is more important than our games of golf, bridge, fishing or hunting.

After twenty-one years of marriage, Mr. and Mrs. Rhiner decided to call it quits. The divorce occurred in May, 1959. During the years of marriage, they were blessed with three daughters and one son. Prior to the divorce, the mother connived with the oldest daughter (then 19) to leave the home and meet with her boy friend in Virginia. Mrs. Rhiner is convinced within her own mind this was the right thing to do. This conviction arises because Mr. Rhiner chastised the daughter about spending $3,000 at college between September and Thanksgiving. Obviously, this was an unwarranted anger on his part, and one which he should have paternally concealed from this fragile child. I do not recall that the testimony reflects whether or not the eldest daughter married her friend in Virginia, but it does reflect she is now on her second marriage.

Immediately after the divorce, Mrs. Rhiner gave her blessing to the marriage of her 16-year-old daughter, who had just completed her sophomore year in high school. With righteous indignation on cross-examination, she observed that of course she had not conferred with Mr. Rhiner about this. Didn't the attorney know the court had awarded her complete custody and control of the minor children. And when the mean old Mr. Rhiner was called on the telephone by this child to ask that he give her away —why, he was no gentleman at all. He was simply horrible about the whole thing and emphatically stated, "No, I won't give you away." Worse than that, he called Mrs. Rhiner on the telephone *while she was at work* and told her he would do everything he could to stop it. The marriage of this child was perfectly proper because she was marrying a college graduate studying for the ministry. Mrs. Rhiner can see no valid reason for a father to have been at all worried about a 16-year-old daughter of his contemplating marriage.

Here, let the court observe the record is devoid of even a suggestion Mrs. Rhiner is a woman of loose morals. To the contrary, the testimony of her pastor, her friends and her business associates persuade the court she is both a virtuous woman and an able and efficient employee. However, most of her witnesses were unacquainted with her home life and her conduct with Terry and Jimmy. To the court, Mrs. Rhiner appears to be the sort of woman cut out for a career rather than marriage and a family. She has written several stories and articles of interest to children which have appeared in religious publications. History records the fact, however, that John Dillinger's father was a minister. It also records the devout Jacob stealing Esau's birthright.

After the marriages of the two older daughters, Mrs. Rhiner set out to prove what a good mother she could be to the two-year-old daughter and four-year-old son then remaining with her. Beginning in October, 1959, until this court temporarily removed these two children from her custody in the Fall of 1961, she had a succession of housekeepers who testified as to the remarkable qualities of motherhood exhibited by her. Too, she had some neighbors who found unwarranted fault with her capacity to be a good mother. All of them she earnestly believes to be consummate liars. All of them were bought off by her husband. Her protestations to the contrary notwithstanding, this court chooses to believe their testimony.

Of necessity, Mrs. Rhiner undertook working for a living. Excepting on Friday evenings, her banking job required from 8:30 A.M. until 5 P.M. on Mondays through Fridays. On Friday, she worked until 8 P.M. The first housekeeper lived in for seven months. During that time, Mrs. Rhiner did not spend more than three evenings with the children. When she came home from work, she would go back to her bedroom, shower, lie down and rest, get up around 8 P.M.. go out and return about 11 P.M., or later. She never fed the children, and when she made the few attempts she did, they would throw the food and cut up until she left. The children had no clothes despite the fact the father was contributing adequate support. The housekeeper bought from her own funds the children's food. The testimony of the succeeding housekeepers was similar in vein. One housekeeper even bought five dresses for the little girl. The whole parade of housekeepers all testified they got their rent free in return for providing the food and otherwise caring for the children. What Mrs. Rhiner did with the money she received for support has not been satisfactorily explained.

One of the neighbors testified as to Jimmy beating a puppy on the head with a toy gun. Another testified to his swinging

a kitten by the tail against a wall till it died. Another testified as to Terry's crushing a puppy in a cloth up against the garage. For hours on end lasting from before daybreak until long after dark, the children would cry. A neighbor with children of the same ages stopped his children from playing with Jimmy and Terry because of their incessant misconduct.

I have mentioned Terry's and Jimmy's episodes of cruelty to the puppies and kitten because I am persuaded no normal, well-adjusted child will deliberately be cruel to small animals. They might well love them to death, as my three-year old girl did her Easter bunny. They might give them a bath and accidentally drown them, and then say, "Stand up, kitty' stand up", as my kid brother did about thirty years ago. They might pick up a "biddy" out on the farm and cuddle it to death, all the time saying, "You sweet little thing", as my mother tells me I did about thirty-eight years ago. But, absent good reason, they will not indulge in deliberate cruelty.

In 1960, rather than let Jimmy, then six, spend part of the summer with his Dad, he was shipped off to a summer camp in the Miami area. Mrs. Rhiner kept telling the children their father did not love them. When he would call on the telephone, she would decline to let him visit on the excuse the children were sick, when, in fact, they were not sick. She would not let the father take the son without also taking the daughter. And, when finally the neighbors prevailed upon the father to do something, Mrs. Rhiner was incensed. After all, was not she the mother of these children? Did she not have the God-given right to possess them, having bourne them. The pity of it is that all Mrs. Rhiner wants is the possession of these children. She is totally and completely incapable of loving them.

When I took the children from Mrs. Rhiner, I told her that it would not preclude her attempting to obtain custody at a later time; that it was my fondest wish she would equip herself to have custody restored to her. This, she has not done. Unfortunately for her, but more unfortunate for the children, she still remains as she was when I saw her in November 1961. She admits to having told the children on the week-ends when she has them that they cannot call the new Mrs. Rhiner "Mother"; that she alone wears that accolade. Yet, when these children came before me separately and alone, each testified he called Mrs. Rhiner "Mommie", and the new Mrs. Rhiner "Mother". It was quite obvious these children had always called Mrs. Rhiner "Mommie". She was the only one of the three at all confused.

No one can quarrel with Mrs. Rhiner's right to go out of an evening; with her right to have fun and recreation. In truth, no

court has the right to set for her certain moral standards by which she must live to enjoy the companionship and society of her children. There are numbers of cases in which courts have allowed women hardly more than street walkers to have custody of the children. In those cases, it did not appear the mother's improprieties affected (at least directly) the upbringing of the children. Mrs. Rhiner's interest was directed too much to the gratification of self. She lost her sense of relative values. For nearly three years, she attended to her living but practically ignored the needs of those nearest her. Perhaps they reminded her too much of her failure in marriage. But it is apparent her first thought in the morning was the support of the transient to the neglect of the permanent. She put recreation before her children's creation, before the molding and growing and developing of the two lives entrusted to her for keeping. She made her life a tragedy by the stimulant of amusement and has not yet awakened to the weakest sort of mother love. As an example, this past summer, she had the right to have the children with her for two months. She did not avail herself of any part of it. She had the right to have the children over the week-ends on every other week-end. She would generally pick them up on Friday evenings and bring them back Saturday afternoons, rather than keeping them through Sunday as she had the right to do. With complete candor, she told me she visited them as frequently as she did on her lawyer's advice.

No one recognizes any better than I that judges are as subject to personal predelictions as anyone else; but I cannot conceive of my mother having taken so little interest in me in the same situation. I cannot conceive of my having as little interest in our four children in the same situation. To me, it is completely abnormal for a parent to have visitation rights and not exercise them.

Because I have a five-year old and a seven-year old child myself, I cannot give too much weight to the testimony of Terry and Jimmy. Both of them stated they wanted to live with "Daddy and Mother". They also stated they wanted to continue visiting "Mommie". The reason I give little weight to their testimony is because most children in that age group will want to remain where they presently are, unless they are being mistreated or otherwise feel insecure. However, I am convinced they were not coached as to what to tell me—and this too comes from my association with my own children. Both of them are happy, well-adjusted children. They have been accorded the rights in their new home to which all children of God are entitled. They are wanted; they are loved. But, more important, they know they are wanted and that they are loved.

Until Mrs. Rhiner comes face to face with herself, there is nothing a court can do to assuage the grief I know this opinion will have on her; but, neither could a psychiatrist be of much help until she meets that same moment of truth. I do not suggest she is insane, but she has a personality problem to overcome before this court could grant her the custody of these children.

This case tends to show the great need for the establishment of a domestic relations court. We need greater latitude, counselling, and reports of home life than we presently have available to us under the adversary system. When a court is dealing with the great treasure of human personality rather than dollars or property rights, it places the court nearer playing the part of the Almighty than any other phase of its activity. In such instances, courts have the power to completely ruin the lives of helpless youngsters. My faith is great enough to know the individual judge, not the impersonal court, will account eternally for errors of judgment. Nevertheless, I am persuaded these children should remain with their father.

The order awarding Mr. Rhiner temporary custody is made permanent. Counsel for plaintiff may prepare a final decree which conforms with this opinion.